**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**HEIDI REAMS,**                                        CASE NO. 3:21 CV 878

      Plaintiff,

      v.                                             JUDGE JAMES R. KNEPP II

**LOCAL 18, INTERNATIONAL**
**UNION OF OPERATING ENGINEERS,**

      Defendant.                                    **MEMORANDUM OPINION AND**
                                       **ORDER**

### INTRODUCTION

Plaintiff Heidi Reams filed suit against Defendant Local 18, International Union of Operating Engineers, alleging claims of disability discrimination under the Americans with Disabilities Act of 1990 as amended ("ADA"), 42 U.S.C. § 12101, *et seq*., and Ohio Revised Code § 4112.01, *et seq*. The matter now before the Court is Defendant's Motion for Summary Judgment (Doc. 26). Plaintiff opposed (Doc. 27), and Defendant replied (Doc. 29).

For the reasons set forth below, Defendant's Motion (Doc. 26) is granted.

### BACKGROUND

Viewing the facts in the light most favorable to Plaintiff, the background of this case is as follows:

Parties Involved

Defendant is a labor organization representing operating engineers in Ohio and Kentucky. (Doc. 1, ¶ 2); (Doc. 26, at 5). Defendant is headquartered in Cleveland and has five district offices located in Columbus, Cleveland, Akron, Toledo, and Middletown. (Plaintiff Depo., at 7-

8)[1]. Defendant's highest officer is the business manager. *Id.* at 7. The next highest position is president. *Id.* The Cleveland headquarters has an office manager; Kathy Allen held this position at the time of the events underlying the Complaint. *Id.* Clerical and accounting staff also work at the headquarters. *Id.* Each district office is led by a district representative and employs business representatives and clerks. *Id.* at 8, 10. Defendant's primary functions are contract negotiations with employers, contract policing, administering its hiring halls, and collecting member dues. *Id.* at 9, 15.

Plaintiff began working for Defendant as a clerk in the Toledo district office in January of 2016. *Id.* at 40; *see also* Doc. 26-1, at ¶ 1. Part of Plaintiff's job was collecting dues from members, usually at the window in the front desk of the union hall. *Id.* at 15. She had to make sure each member was being charged the appropriate dues. *Id.* at 21. Plaintiff was responsible for making sure the dues were timely paid and for notifying members of upcoming payments. *Id.* Plaintiff also collected and recorded initiation fees for new members according to the union subdivision the member was seeking to join. *Id.* at 23.

Plaintiff's Terms of Employment

Defendant published memoranda, in a style akin to a handbook, which governed the rules and policies of employment for all employees. *Id.* at 10. The memoranda stated employees are allotted five days of sick leave annually, and an illness exceeding three days required a doctor's note. *Id.* at 11. Defendant also published job-specific memoranda, including one governing the rules of district-office clerks. *Id.* at 12.

In carrying out her above-mentioned responsibilities, Plaintiff kept records of all fees and dues collected in a spreadsheet document called a "cash sheet". *Id.* at 25. The cash sheet

---

1. Plaintiff's Deposition is located at ECF Doc. 26-1.

contained employee information and identifiers and allowed clerks to keep track of each member's payments and outstanding balance. *Id.* at 25-26. Clerks were responsible for balancing cash sheets at the end of each workday. *Id.* at 26. Headquarters used the cash sheets to determine which members still owed dues and inputted the information on the cash sheets into a system maintained at headquarters. *Id.* at 27. Clerks also recorded monies deposited on the cash sheet and kept receipts. *Id.* In addition to sending receipts to headquarters, clerks ensured members received receipts when dues are paid. *Id.* at 28. The process is audited by the United States Department of Labor. *Id.* Clerks also maintained the petty cash fund, made change for paying members, and sold merchandise used for the "PEP fund" (funds used for political purposes). *Id.* at 29-32.

Plaintiff's Injury

On July 26, 2019, Plaintiff was injured during treatment with her chiropractor. *Id.* at 65. She suffered a torn carotid artery that resulted in 70 percent blockage of her blood flow. *Id.* at 66. After the injury, Plaintiff potentially had a TIA, which doctors described as being similar to a ministroke. *Id.* at 67. She was also at risk for a major stroke. *Id.* Plaintiff was put on Coumadin, a blood thinner, to reduce her chance of stroke. *Id.* at 67-68. As a result of her injury, Plaintiff was advised she could no longer see a chiropractor or massage therapist, could not ride roller coasters, and could not have children. *Id.* at 77.

From July 26, 2019, until August 19, 2019, Plaintiff was unable to work while recovering. *Id.* at 68. She was given paid sick leave during the entire period she was unable to work, in excess of the five sick days allotted per Defendant's rules and policies. *Id.* at 68-70. On August 5, 2019, Plaintiff requested disability and FMLA paperwork because she was unsure what type of leave or accommodation she would need. *Id.* at 71. On August 19, 2019, Plaintiff

returned to work in accordance with her doctor's recommendation. *Id.* at 73. Plaintiff had no medical restrictions that would prevent her from performing her duties as a clerk. *Id.* Her only request was for a headset so she would not have to move her neck to the side. *Id.* Plaintiff was able to sleep, drive her car, sit, and write just as well as before her injury. *Id.* at 78.

Cash Sheet Discrepancy

At the time Plaintiff left for her appointment with the chiropractor on July 26, 2019, there was a $140 overage on the cash sheet and the petty cash fund was short $42.59. *Id.* at 78. Also, there was an extra beanie and zip hoodie in the PEP fund (*id.* at 79), although this issue was later resolved (Doc. 27-1, at ¶ 12). Defendant informed Plaintiff of the discrepancy while she was on leave. (Plaintiff Depo., at 78). Plaintiff stated she could not confirm the discrepancy unless the cash sheet was in front of her. *Id.* at 79. Upon her return to work on August 19, 2019, Plaintiff attempted to remedy the discrepancy. Plaintiff testified she was not fully certain but believed the cash sheet and petty cash funds were mixed and $40 missing from petty cash was incorrectly attributed to the cash sheet. *Id.* at 82. The remaining $100 discrepancy on the cash sheet resulted from a member overpaying, which Plaintiff failed to notice. *Id.* at 81; Doc. 26-13, at 37-38. Plaintiff's explanation accounts for all but $2.57 missing from the petty cash fund. *Id.* at 82. Plaintiff was unable to recall what the other $40 in petty cash was spent on, but believed it was to make change for a member. *Id.*

Defendant terminated Plaintiff's employment within 48 hours of her returning to work. *Id.* at 83-84. Richard Dalton, Defendant's employee, told Plaintiff she was being terminated for the discrepancy in funds that occurred leading up to and during her absence for the injury. *Id.* Plaintiff testified she may have also been told she was being terminated for past mistakes but did

4

not remember specifically. *Id.* Plaintiff had no limitations on her ability to work as a clerk at the time she returned. *Id.* at 73.

History of Work-Related Errors

Aside from the cash sheet discrepancy that coincided with Plaintiff's medical absence discussed above, Plaintiff had a documented history of work-related mistakes. During her deposition Plaintiff confirmed these mistakes, which included charging a member an incorrect initiation fee (*id.* at 37-38), identifying the wrong Local 18 branch into which a person was seeking admission (*id.* at 39), and charging a member the wrong purchase amount (*id.* at 41). Plaintiff testified under oath that over the course of nearly three and a half years working for Defendant, she accumulated errors related to overcharging members, charging members more than Defendant is legally allowed to charge, and failing to properly account for money members gave her. *Id.* at 88. In sum, Plaintiff testified she had no basis to dispute the majority of the mistakes represented in approximately 270 pages documents contained in Documents 26-11 and 26-12. *See id.* at 35-65. Plaintiff did testify, however, that a small portion were not mistakes at all, but instead were discrepancies caused by members paying future dues in advance. *See, e.g.*, *id.* at 43. While the exact number of mistakes is in dispute, there is no dispute that Plaintiff had a history of job-related errors while an employee of Defendant. There is no evidence Plaintiff was ever formally disciplined for the errors prior to her termination. (Doc. 27-1, at ¶ 6).

Application for Union Membership

After termination from her position as a clerk, Plaintiff went to Defendant's District 2 office to apply for a bargaining member position as a heavy machinery operator. *Id.* at ¶ 14; Plaintiff Depo., at 75-76. She sought new employment with the union because she was only a few months away from her pension vesting at the time of her termination. *Id.* at 17.

The procedure to register for work for Defendant is governed by the policies contained in the heavy highway agreement, which is a collective bargaining agreement. *Id.* at 89. A person must fill out a registration card to receive work through the union hall. *Id.* at 91. Work is then distributed on a first in/first out basis where work opportunities are offered to qualified applicants who have been out of work the longest. *Id.* The registration card requires an applicant to identify each of the equipment certifications an applicant has obtained and list machinery the operating engineer has operated and wants to be dispatched to in the future. *Id.* at 92. An individual is only offered a job if she possesses the requisite certification and equipment experience. *Id.* at 96. Plaintiff testified she has no certifications or experience operating heavy machinery. *Id.* at 93.

When Plaintiff attempted to register, she was told she needed to submit a medical release to apply and that the release must contain the language used in the model, which is:

> Can operate heavy equipment in a safety-sensitive environment with no restrictions.

(Doc. 26-18). Plaintiff produced a medical release from a physician that read:

> It is my medical opinion that Heidi Reams is able to return to work without any restrictions. Heidi Reams is also able to operate heavy equipment in a safety sensitive environment. If you have any questions or concerns, please don't hesitate to call.

(Doc. 26-19). Defendant rejected Plaintiff's medical release. (Doc. 27-1, at ¶ 14). Plaintiff never submitted a supplemental medical release mirroring the exact language required by Defendant. (Plaintiff Depo., at 107).

### STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## DISCUSSION

Plaintiff alleges that Defendant, Local 18, International Union of Operating Engineers, committed disability discrimination when it terminated her employment as a clerk in violation of the Americans with Disabilities Act of 1990 as amended, 42 U.S.C. § 12101, *et seq*., and Ohio Revised Code § 4112.01, *et seq.*[2] Plaintiff contends her torn carotid artery, which caused a 70 percent blockage and placed her at a heightened risk for stroke, is a disability for the purposes of the ADA. (Doc. 27, at 20). Plaintiff argues in the alternative that she was perceived as having a

---

2. The Second Amended Complaint (Doc. 12) also contains factual allegations of retaliation and failure to accommodate. However, Plaintiff expressly states she has not "asserted independent causes for such claims." (Doc. 27, at 32-33). Moreover, Plaintiff also states she is not pursuing a claim for failure to hire with respect to being refused the opportunity to register as a bargaining member for heavy equipment operator work. *Id.* Instead, these allegations are pled for the purpose of demonstrating Defendant's pretext when it chose to terminate Plaintiff's employment as a clerk. Insofar as the Second Amended Complaint contemplates causes of action other than unlawful termination, the Court deems those claims abandoned.

disability. *Id.* at 24. Plaintiff states her termination was based on pretext for discrimination. *Id.* at 26.

Defendant moves for summary judgment arguing Plaintiff was neither disabled nor perceived as being disabled, and alternatively, that Defendant had a legitimate non-discriminatory reason for terminating her and Plaintiff cannot prove the termination was pretext for discrimination. (Doc. 26, at 23-26)

For the following reasons, Defendant's motion is granted.

Disability Discrimination

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Because Ohio's disability discrimination law parallels the Americans with Disabilities Act in all relevant respects . . . court[s] appl[y] the same analytical framework, using cases and regulations interpreting the ADA as guidance in [] interpretation of Ohio Rev. Code § 4112.02." *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015) (internal citations omitted). "ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on 'direct' or 'indirect' evidence of discrimination.'" *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 297 (6th Cir. 2019). "Direct evidence in this context refers to a method of proof, simply meaning that a plaintiff may directly present evidence, of any nature, to show that it was probable that an employer acted with discriminatory intent." *Bligh-Glover v. Rizzo*, 2012 U.S. Dist. LEXIS 141512, *30 (N.D. Ohio 2012).

If a plaintiff does not present any direct evidence of discrimination, her claim is evaluated using the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Gamble v. JP Morgan Chase & Co.*, 689 F. App'x 397, 401 (6th Cir. 2017) (citing *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)). A plaintiff must first establish a *prima facie* case of employment discrimination. If she can establish such a *prima facie* case, then the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual. *Id.* To survive a motion for summary judgment, a plaintiff need not definitively prove a reason is pretextual, but rather "must prove only enough to create a genuine issue as to whether the rationale is pretextual." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016); *see also Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019) ("the employee must prove only enough to create a genuine issue as to whether the rationale is pretextual").

Here, the parties agree that Plaintiff's claims arise out of indirect evidence of discrimination[3]. (Doc. 27, at 19); (Doc. 26, at 24)

*Prima Facie Case*

"To establish a claim for disability discrimination under the indirect method, a plaintiff must first establish a prima facie case of discrimination by showing that (1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment decision, (4) the employer knew or had reason to

---

3. The Court notes that failure to accommodate and refusal to hire due to disability may be used as evidence of direct discrimination in many circumstances. *Blanchet v. Charter Communs., LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022) ("We therefore apply the direct evidence test to failure to accommodate claims"). However, Plaintiff opted to argue singularly under the indirect discrimination framework and has abandoned any direct discrimination theory. (Doc. 27, at 19, 32-33).

know of the plaintiff's disability, and (5) the position remained open while the employer sought

other applicants or the disabled individual was replaced." *Ferrari*, 826 F.3d at 891-92.

Defendant argues Plaintiff is unable to meet the first element. "Under this element, a

plaintiff can prove a qualifying 'disability' by demonstrating that she (1) is 'actually disabled,'

meaning the individual possesses 'a physical or mental impairment that substantially limits one

or more major life activities of such individual'; (2) has 'a record of such an impairment'; or, (3)

is 'regarded as having such an impairment.'" *Harrison v. Soave Enters. L.L.C.*, 826 F. App'x

517, 522 (6th Cir. 2020) (citing 42 U.S.C. § 12102(1), (3)). Plaintiff attempts to demonstrate she

has a qualified disability under the first and third prongs: actual disability, and in the alternative,

regarded as having a disability.

<u>Actual Disability</u>

"To prove that she is 'actually disabled' under § 12102(1)(A), Plaintiff must show 'a

physical or mental impairment that substantially limits one or more major life activities.'"

*Harrison*, 826 F. App'x at 523 (internal quotations omitted). The statute identifies the following

major life activities by way of a non-exhaustive list:

> (A) In general. For purposes of paragraph (1), major life activities include, but are
> not limited to, caring for oneself, performing manual tasks, seeing, hearing,
> eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning,
> reading, concentrating, thinking, communicating, and working.

> (B) Major bodily functions. For purposes of paragraph (1), a major life activity
> also includes the operation of a major bodily function, including but not limited
> to, functions of the immune system, normal cell growth, digestive, bowel,
> bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive
> functions.

42 U.S.C. § 12102(2). Thus, for purposes of the statute, "major life activities" contemplates both

"activities" in the traditional sense and major bodily functions. *Id.*

10

"Under the applicable ADA regulations, [courts] determine whether a disability substantially limits major life activities through comparison of the person claiming a disability to 'most people in the general population.' An impairment need not prevent, or significantly or severely restrict a major life activity to be substantially limiting." *Harrison*, 826 F. App'x at 523 (citing 29 C.F.R. § 1630.2(j)(1)(ii)) (internal citations omitted). "Similar to the term major life activities, the term 'substantially limits' shall be construed broadly in favor of expansive coverage and is not meant to be a demanding standard." *Id.* (internal quotations omitted). "And for cases on the margin, the Act includes a 'rule of construction' that tips in favor of coverage. It instructs that the definition of disability 'shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms' of the ADA." *Darby v. Childvine, Inc.*, 964 F.3d 440, 445 (6th Cir. 2020) (quoting 42 U.S.C. § 12102(4)(A)). "Therefore, framed properly in light of post-2008 ADA law, the question before us is whether [Plaintiff] submitted enough evidence to show that she is substantially limited in her [circulatory functions]". *Harrison*, 826 F. App'x at 524.

Defendant contends Plaintiff's partially blocked artery is not a qualifying disability under the ADA because she can provide no evidence it substantially limited one or more of her major life activities. (Doc. 26, at 25). Defendant argues that the injury does not qualify because it prevented her neither from doing any part of her job nor from engaging in the major life activities listed in the ADA. *Id.* Defendant further asserts the carotid artery injury and associated partial blockage are not qualifying disabilities because each merely increases the potential Plaintiff suffers a stroke or other condition that would affect her ability to engage in major life activities. *Id.*; Plaintiff Depo., at 73-74. In support of this argument, Defendant looks to Plaintiff's testimony there was no part of her job she was unable to do when she returned to

11

work, and she could still eat, sleep, drive, walk, and write the same as before the injury. (Plaintiff Depo., at 77-78).

Defendant relies on *Darby v. Childvine, Inc.* to argue that the mere potential for a substantial limitation on a major life activity is insufficient to constitute a disability under the ADA. 964 F.3d at 447. While *Darby* did, as Defendant argues, hold a condition which only presents the possibility of a disability does not qualify for protections under the ADA, it more importantly found that substantial limitations to major bodily functions, even where specific activities a plaintiff is unable to engage in are not identified, qualify as a disability under the ADA. *Id.* In *Darby*, the Sixth Circuit held "a genetic mutation (BRCA1) that limit[ed plaintiff's] normal cell growth *and* a medical diagnosis of abnormal epithelial cell growth serious enough to warrant a double mastectomy" substantially limited the major bodily function of normal cell growth which is a qualified major life activity for purposes of the ADA. *Id.* at 445 (emphasis in original).

Defendant's argument misses the mark for two reasons. First, the fact Plaintiff was able to perform all her work-related duties upon return does not disqualify her from ADA protections. "Indeed, a plaintiff need not show that her disability renders her unable to work." *Harrison*, 826 F. App'x at 523. Plaintiff's ability to work operates in favor of her establishing a *prima facie* case; even in her condition, "she [was] otherwise qualified for the position, with or without reasonable accommodation". *Ferrari*, 826 F.3d at 891-92. Underlying the rationale behind the ADA is the notion that disabled people are able to work and participate in society, and ought to be able to do so without discrimination. The stereotype that disabled people cannot work contradicts the fundamental purpose of the ADA. Plaintiff's ability to work does not weigh against a finding that she had an actual disability. *Holiday v. City of Chattanooga*, 206 F.3d 637,

12

643 (6th Cir. 2000) ("The thesis of the ADA is simply this: That people with disabilities ought to be judged on the basis of their abilities . . . The ADA thus serves to prohibit employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics.") (internal quotations omitted).

Second, characterizing Plaintiff's condition as merely an increased potential she may suffer a stroke or other ailment is too narrow. The evidence shows that on or around the time her employment was terminated she suffered from the following conditions:

- Right carotid artery dissection with a small thrombus. (Doc. 26-2, at 44).

- Pain in the occipital region, neck and right side of her jaw. *Id.* at 42.

- Pain radiating down her right arm while driving. *Id.*

- 70% blockage in her carotid artery. (Doc. 26-1, at ¶ 9).

- Coumadin prescription to combat the risk of stroke. *Id.* at ¶ 10.

- Possible TIA, which is "essentially, a ministroke". (Plaintiff Depo., at 67).

- A pseudoaneurysm associated with the carotid artery injury. (Doc. 26-2, at 28).

Contrary to Defendant's representation that Plaintiff's injuries "could [only] potentially cause problems", the evidence shows Plaintiff suffered from real injuries to her circulatory system contemporaneous with her termination. (Doc. 29, at 10). In determining whether these conditions substantially limited a major life activity, for each condition, the "disability determination [must be] made 'without regard to the ameliorative effects of mitigating measures.'" *Grose v. Mnuchin*, 2019 U.S. App. LEXIS 29380, *13 (6th Cir. 2019) (quoting 42 U.S.C. § 12102(4)(E)(i)).

This action is factually similar to *Suggs v. Cent. Oil of Baton Rouge, LLC*, a case out of the Middle District of Louisiana. 2014 U.S. Dist. LEXIS 90825 (M.D. La. 2014). In *Suggs*, the

13

plaintiff suffered from carotid artery disease and sought a week of leave to have surgery to clear blockages in his arteries. *Id.* at *3. After undergoing surgery, the plaintiff informed his employer the same day that he was cleared to return to work. *Id.* A few days later, the "[p]laintiff was told that Central Oil was eliminating his position through a reduction in force caused by its declining used oil business." *Id.* at *3-4. The *Suggs* plaintiff sued for ADA discrimination arguing carotid artery disease was a disability. *Id.* at 4. The basis for the plaintiff's *prima facie* case was that "in its unmitigated state, his carotid artery disease substantially limit[ed] his circulatory function by causing a build-up of plaque in the artery walls, leading to blood clots, which [could] prevent blood from flowing to his brain or cause a stroke. To mitigate his condition, [p]laintiff t[ook] prescription blood thinners and cholesterol controlling drugs (Plavix, aspirin, and Lipitor)." *Id.* at *13-15. The *Suggs* court held, "[d]rawing all reasonable inferences in [p]laintiff's favor, a jury could reasonably conclude that he suffers from an actual disability" because "in its unmitigated state, his carotid artery disease substantially limits his circulatory function by causing a build-up of plaque in the artery walls, leading to blood clots, which can prevent blood from flowing to his brain or cause a stroke." *Id.* at *15.

Within the Sixth Circuit, courts have found that other circulatory conditions are qualified disabilities under the ADA. For example, "hypertension, even if controlled with medication or in remission, has been recognized as a disability that substantially limits a major life activity." *Watson v. Ciena Healthcare Mgmt.*, 2013 U.S. Dist. LEXIS 141872, *15-16 (E.D. Mich.); *see also Watters v. Summit Cnty.*, 2016 U.S. Dist. LEXIS 84358, *19 (N.D. Ohio) ("Plaintiff is clearly disabled" where she had a blood-clotting disorder); *Maat v. Cnty. of Ottawa*, 657 F. App'x 404, 407 (6th Cir. 2016) (qualified disability was not a point of debate where plaintiff had three blood clots in her right lung and another in her brain and was put on blood-thinning

14

medicine to reduce the risk of stroke and heart failure); *Dainiak v. Oak Ridge Associated Univs*., 2019 U.S. Dist. LEXIS 241322, *5 (E.D. Tenn.) ("bilateral knee prostheses and blood clotting issue" were disabilities).

Similar to the facts in *Suggs*, Plaintiff's condition caused substantial blockage in her artery. While the condition also greatly increased the risk of stroke, it is not the risk of a more serious medical condition that establishes a disability. Instead, it is the substantial blockage to her artery, the likelihood she suffered a ministroke, and the pain associated with the injury that were present at the time she was terminated that constitute a qualified disability. *See, e.g.*, *Hall v. U.S. Cargo & Courier Serv., LLC*, 2019 U.S. Dist. LEXIS 97097, *25 (S.D. Ohio) ("under the ADA, as amended, a major life activity includes the operation of a major bodily function including the endocrine function . . . it should be easily concluded that diabetes substantially limits endocrine function.") (internal citations and quotations omitted); *see also Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 446 (6th Cir. 2018) ("hypothyroidism is an affliction of the endocrine system, a reasonable trier of fact could conclude that Barlia suffered from an impairment that limits one or more major life activities[.]") (internal quotations omitted). And unlike Sixth Circuit cases where plaintiffs relied on medical records describing conditions outside of a lay person's knowledge, *e.g.*, *Baum v. Metro Restoration Servs.*, 764 F. App'x 543, 546 (6th Cir. 2019) ("That's because his impairments, unlike more common or less complicated ones, require medical knowledge to understand. His medical records contain diagnoses such as 'AV block, Mobitz 1' and 'Bradycardia' – words that rarely appear outside the medical profession"), here a reasonable juror would be able to appreciate the severity of Plaintiff's condition without the assistance of a medical expert. *See, e.g., Suggs*, 2014 U.S. Dist. LEXIS

90825. Thus, Plaintiff has produced evidence sufficient to show a substantial limitation of her circulatory function and overcome summary judgment on this prong of her *prima facie* case.

<u>Perceived Disability</u>

Although Plaintiff has produced sufficient evidence in support of the first prong of her *prima facie* case to overcome summary judgment by virtue of showing an actual disability, the parties briefed the issue of "perceived" disability in the alternative. (Doc. 27, at 24); (Doc. 29, at 10-12). Therefore, the Court will also address this issue. "[T]o state the threshold condition of a 'regarded as' ADA claim, an employee need only show that her employer believed she had a 'physical or mental impairment,' as that term is defined in federal regulations. The employer may then rebut this showing by pointing to objective evidence that the impairment is or would be both transitory and minor." *Harrison*, 826 F. App'x at 526 (internal citations and quotations omitted).

Plaintiff asserts she made Defendant aware of her carotid artery injury prior to her August 19th return to work, and Defendant later required her to submit a medical release when applying for the bargaining unit position because of its knowledge of her injury. *Id.* at 25. Defendant rebuts that knowledge of an injury alone is insufficient to establish Plaintiff was perceived as being disabled. (Doc. 29, at 11). Defendant does not argue Plaintiff's injury was transitory and minor.

First, Defendant requiring Plaintiff submit a medical release to ensure she does not suffer from an impairment does not suggest she was regarded as disabled. "An employer's request that an employee undergo a medical exam may signal that an employee's job performance is suffering, but that cannot itself prove a perception of a disability because it alone does not prove that the employer perceives the employee to have an impairment that substantially limits one or

more of the employee's major life activities." *Johnson v. Univ. Hosps. Physician Servs.*, 617 F. App'x 487, 491 (6th Cir. 2015) (internal quotations omitted); *see also Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810-11 (6th Cir. 1999) (finding employer did not regard employee as disabled when only evidence employee presented was that employer made them undergo a mental and physical examination); *Glover v. Fibercorr Mills, LLC*, 2018 U.S. Dist. LEXIS 217421, *15-16 (N.D. Ohio) ("And requiring an employee to undergo a test or evaluation to ensure he is not suffering from an impairment does not amount to regarding the employee as disabled."). This is especially true in this instance because Plaintiff conceded it is standard procedure for all operating engineers seeking to register for work after an injury to complete the same medical release she was given. (Plaintiff Depo., at 102-03).

Second, "[i]t is well established that an employee cannot show that h[er] employer regarded h[er] as disabled merely by pointing to that portion of the record in which h[er] supervisor admitted that he was aware of plaintiff's medical restrictions and modified plaintiff's responsibilities based on them." *Glover*, 2018 U.S. Dist. LEXIS 217421 at *15. Plaintiff testified that at the time of her termination she had informed Defendant she was able to return to work as a clerk without any restrictions and had only requested a headset so that her "neck wasn't to one side or the other." (Plaintiff Depo., at 72-73). Plaintiff also cites testimony showing Defendant was aware of her injury during her two-week absence, (Doc. 27-5, 34-35); (Doc. 27-4, at 20-21), and further, evidence Defendant received a letter stating Plaintiff could not return to work for two weeks due to her injury (Doc. 27-3, at 56). Alone, evidence showing Defendant had knowledge of the carotid artery injury is insufficient to create a genuine issue of material fact that Plaintiff was perceived as being disabled.

Furthermore, contrary to Plaintiff's representation in her opposition brief (Doc. 27, at 25), none of the evidence she points to demonstrates Defendant had knowledge her condition persisted after she returned to work. Plaintiff also provides no evidence stating to what degree, if any, Defendant was aware of her condition upon return. There is no evidence Defendant knew of the severity, lasting effects, or other details that would lead it to know "that the injury or impairment was of sufficient magnitude to substantially limit one or more major life activities." *Dorsey v. Dejoy*, 2022 U.S. Dist. LEXIS 56305, *42 (S.D. Ohio); *see also Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 369 (6th Cir. 2013) ("Knowledge of an employee's symptoms, however, does not necessarily equate to knowledge of his disability."). Plaintiff has failed to provide evidence creating a genuine issue of material fact as to Defendant perceiving her as being disabled at the time of the adverse employment action.

Nevertheless, because Plaintiff has shown an actual disability, she has satisfied the disability prong of her *prima facie* case. The remaining elements of the *prima facie* case are not disputed. Therefore, Plaintiff has produced sufficient evidence to overcome summary judgment on her *prima facie* case and the burden shifts to Defendant to articulate a non-discriminatory explanation for terminating Plaintiff's employment.

*Non-discriminatory Explanation*

Defendant asserts it terminated Plaintiff's employment because of her history of poor performance. Specifically, Plaintiff had a long history of "repeated accounting errors" and the improper accounting of union funds in the weeks leading up to her termination. (Doc. 26, at 27). Defendant has met its burden in articulating a non-discriminatory reason. Her supervisor, Kathy Allen, testified Plaintiff did not dispute she made work related errors when the issue was brought to her attention. (Doc. 26-8, at 68-70). Other evidence includes emails notifying Plaintiff she

18

made errors in the initiation report from October and November 2018 (Doc. 26-10, at 1); multiple errors to cash sheets (*id.* at 4-5, 7-8, 10-13); Plaintiff notifying a member of an accounting error (*id.* at 2); and mistakes in the date of a member's registration (*id.* at 9).

Defendant's business manager, Richard Dalton, testified Plaintiff often emailed incomplete data and sent cover sheets with incorrect dates; he further described her typing as "terrible" and said her "emails were bad". (Doc. 26-15, at 39-41). Dalton testified he counseled Plaintiff on her mistakes but Defendant "hardly ever documented any disciplinary issues". *Id.* at 41-42. Ismael Gutierrez, a business representative for Defendant, testified Plaintiff had failed to account weeks for members' for service dues. (Doc. 26-14, at 17-18).

Most importantly, Plaintiff does not deny she accumulated "hundreds of pages" of documented errors over the course of three and a half years which include overcharging members and failing to account properly for the money members gave her. (Plaintiff Depo., at 87-88).

Defendant has sufficiently articulated a non-discriminatory explanation for terminating Plaintiff's employment. *See Gamble*, 689 F. App'x at 401. The burden therefore shifts back to Plaintiff to prove Defendant's explanation is pretextual. *Id.*

*Pretext*

"Under the law of [the Sixth] circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Ferrari*, 826 F.3d at 895. In analyzing pretext, the Sixth Circuit "has employed a version of the 'honest belief' rule . . . The formulation used provides that as long as the employer honestly believed the reason it gave for its employment action, an employee is not

able to establish pretext even if the employer's reason is ultimately found to be mistaken." *Id.* "[T]o prove that the offered, non-discriminatory basis for the employment action is 'honestly held,' the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* at 896 (internal quotations omitted).

Plaintiff asserts she can establish pretext by showing Defendant's purported reasons for terminating Plaintiff were factually false, the allegations of work-related errors are insufficient to support termination, post-termination conduct, and close temporal proximity between Defendant learning of her disability and terminating her employment. The Court addresses each in turn.

### $142.57 Discrepancy

Plaintiff argues the $142.57 discrepancy in funds that coincided with her absence could not have motivated her termination because she was able to provide an explanation that remedied $140 and the remaining $2.57 is insufficient to warrant the adverse employment action. (Doc. 27, at 26-28). Plaintiff's argument is two-fold. First, she asserts the $140 discrepancy may not be used to establish a legitimate non-discriminatory reason because the discrepancy was an easily correctable run-of-the-mill mistake. *Id.* at 27-28. Second, Plaintiff argues the unaccounted for $2.57 in petty cash is not a serious offense and testimony from Defendant's employees to the contrary is undermined by Defendant's response after discovering the discrepancy. *Id.* at 28-29.

Viewing the facts in the light most favorable to Plaintiff, Defendant's decision to terminate Plaintiff's employment based in part on the cash sheet and petty cash discrepancies was reasonable. Plaintiff's testimony indicated the discrepancy was legitimate (Plaintiff Depo., at 78-79), and at best, she had improperly intermingled petty cash into the cash sheet funds (*id.* at 82), did not keep a receipt of what the petty cash was spent on (*id.*), failed to make proper change

for a member which resulted in a $100 overcharge (Doc. 27-5, at 20), and was unable to account for the remaining $2.57 missing from petty cash (Plaintiff Depo., at 82).

Plaintiff argues these mistakes would have been easily remedied if she was not injured/absent and she had never been disciplined for the same issues and mistakes in the past. (Doc. 27, at 27-28). However, the evidence shows Plaintiff had been notified and counseled about her errors on numerous occasions throughout her employment with Defendant. *See, e.g.*, Doc. 26-8, at 68-70; Doc. 26-10, at 1, 2, 4-5, 7-13.

Similarly, Plaintiff has not shown that the $2.57 petty cash she was unable to account for is insufficient to warrant her dismissal. Plaintiff argues Defendant overstates the seriousness of the offense, evident by the lack of investigation by the Department of Labor and Defendant's employee being unable to recall how or if the funds were ever replaced. (Doc. 27, at 29). Plaintiff also argues she was never disciplined for similar conduct in the past. *Id.*

Defendant provides evidence speaking to the seriousness of petty cash discrepancies. Brett LaFaso, a district representative working for Defendant, agreed in his deposition that missing petty cash is a "pretty big deal" and that petty cash must be accounted for "down to the penny". (Doc. 29-8, at 49-51). Dalton testified "[c]ash being off in a Labor Union is a major issue with the Department of Labor". (Doc. 26-15, at 59). Plaintiff herself testified she was aware the Department of Labor audited Defendant's books. (Plaintiff Depo., at 28).

Plaintiff argues the apparent lack of repercussions for the missing petty cash raises a genuine issue of material fact as to whether the mistake is serious enough to warrant her dismissal. However, the lack of government enforcement action against Defendant or the inability for a single employee (LaFaso) to recall how Defendant replenished the petty cash fund does not speak to the seriousness of the infraction or raise a genuine dispute as to whether it is

sufficient to warrant dismissal. *Williams v. Holt*, 2006 U.S. Dist. LEXIS 55148, *3-4 (E.D. Tenn.) ("A plaintiff facing the prospect of summary adjudication cannot sit back and simply poke holes in the moving party's summary judgment motion . . . but instead, must present material evidence in support of those allegations.") (internal citations and quotations omitted). Plaintiff has not provided any evidence supporting her position that missing funds from petty cash is not a serious offense; she simply asks for additional evidence from Defendant, which has already produced evidence supporting its position. Moreover, Plaintiff's position ignores that she openly admits she made an accounting error and was unable to retroactively explain where the missing funds went. (Plaintiff Depo., at 82) ("There is no way to account for the $2.57."). Coupled with similar mistakes for which she counseled in the past, Plaintiff has not carried her burden in showing this reason was pretextual.

<u>History of Errors</u>

Plaintiff argues she was never disciplined for prior similar conduct to the discrepancy in funds that arose during her injury absence, and that because the only changing variable was her injury, she can establish a genuine issue of material fact as to whether Defendant's proffered reasons are pretextual. (Doc. 27, at 29). However, Defendant has produced evidence of numerous infractions for which Plaintiff was counseled during her employment. *See, e.g.,* Doc. 26-8, at 68-70; Doc. 26-10, at 1, 2, 4-5, 7-13. Defendant also directs this Court to deposition testimony that Plaintiff made more errors than others in her position. For example, clerk Kimberly Roberts testified, "I would say [Plaintiff] made anywhere between 60 and 75 percent more errors in the short time that she was here than I made in the whole time I was a clerk." (Doc. 26-7, at 75). Dalton testified:

> A:     As far as things that weren't right or needed to be corrected, I had more interaction with District 2 and Heidi than other districts.

22

Q: Okay. And how frequent was that?
. . .
A: Half a dozen times a year.

Q: For the other four districts, how many times a year would you say you had
  to have those same types of conversations with the clerks?
. . .
A: Maybe one or two.

(Doc. 26-15, at 32-33). And most importantly, Plaintiff testified she was made aware of mistakes

in the past, including overcharging members and failing to properly account for money members

gave her. (Plaintiff Depo., at 88).

  Plaintiff's reliance on *Babb* is also ineffectual. In *Babb,* the defendant stated the plaintiff

committed two critical errors justifying her termination. *Babb v. Maryville Anesthesiologists*

*P.C.*, 942 F.3d 308, 322 (6th Cir. 2019). In response, the plaintiff "submitted expert testimony

suggesting that she acted reasonably during both incidents, and in accordance with local CRNA

standards." *Id.* The Sixth Circuit reasoned "[t]his dispute matters because the less serious Babb's

clinical mistakes, the more likely they were not the 'real' motivation behind Babb's

termination." *Id.* There is no similar dispute here. While Plaintiff contests four of the infractions

documented by Defendant, she does not dispute the discrepancy that immediately preceded her

termination, and agrees she committed dozens of infractions that were documented over the

course of her employment. (Plaintiff Depo., at 64-65, 85-88).

  Plaintiff's assertion she had never been disciplined in the past does not reveal the totality

of circumstances. Plaintiff had been made aware of mistakes, verbally counseled, and received

multiple emails informing her of the mistakes and counseling her to improve in the future. Thus,

the evidence of Plaintiff's history of errors and associated feedback from Defendant does not

raise a genuine issue of material fact that her termination was pretextual.

<u>Post-Termination Conduct</u>

Plaintiff also argues Defendant's refusal to allow her to apply as an operating engineer after her termination is circumstantial evidence demonstrating Defendant's reason for terminating Plaintiff was pretextual. (Doc. 27, at 31-32). She argues the medical release submitted by Plaintiff was materially the same as the one Defendant required as standard procedure, and as such, Defendant's refusal to allow Plaintiff to apply for the operating engineer position was not reasonable and is evidence of Defendant's discriminatory purpose. *Id.*

Comparing the medical release language required by Defendant to the language of the release submitted by Plaintiff reveals the release Plaintiff submitted cleared her to work as an operating engineer but was not identical to the language Defendant required. *Compare* Doc. 26-18, *with* Doc. 26-19. Although Plaintiff argues in her opposition brief that she was precluded from applying because of the medical release, her sworn statement indicates only that Defendant rejected her medical release as a result of the language differences. (Doc. 27-1, at ¶ 14). There is no evidence suggesting Plaintiff was told she could not resubmit her release using the exact language Defendant required. However, Plaintiff testified she never attempted to remedy the release. (Plaintiff Depo., at 107-08).

Furthermore, Plaintiff's testimony indicates she was not qualified for the position for which she applied. She testified that to be eligible for work through the union, an operating engineer was required to fill out and submit a registration card which listed the candidate's certifications and relevant work experience. *Id.* at 92. When work opportunities arose, it was assigned to a qualified individual. *Id.* at 94-96. Plaintiff had no certifications or relevant work experience. *Id.* at 92-94. Plaintiff conceded in her deposition that she would not have been

24

qualified for work in the role she was applying for even if Defendant accepted her medical release. *Id.* at 96-97.

In light of Plaintiff's lack of qualifications for the role and that she never attempted to remedy her medical release, no reasonable juror could find Defendant's post-termination conduct to be evidence of pretext.

<u>Temporal Proximity</u>

Plaintiff argues temporal proximity proves her termination was pretext for discrimination. (Doc. 7, at 31). Defendant terminated Plaintiff's employment within a month of learning of her carotid artery injury. However, "the temporal proximity argument, on its own, fails because 'temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual.'" *Sublett v. Masonic Homes of Ky., Inc.*, 2022 U.S. App. LEXIS 19876, at *20 (6th Cir. 2022) (quoting *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001)). Because all other evidence identified by Plaintiff is either "irrelevant or insufficient, temporal proximity is not enough to establish pretext in this case." *Id.*

Defendant is entitled to judgment in its favor because Plaintiff has failed to create a genuine issue of material fact as to whether Defendant's proffered reasons for terminating Plaintiff's employment were pretextual.

CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant's motion for summary judgment (Doc. 26) be, and the same hereby is, GRANTED.

 *s/ James R. Knepp II*
UNITED STATES DISTRICT JUDGE

25